Good morning, Your Honors. May it please the Court, Kenneth M. Stern for appellant. In a case involving whether or not there's prejudice from prosecutorial vouching as improper, the weaker the evidence that is independent of and not tainted by the vouching, the stronger showing of prejudice. In this case, there is no evidence independent of the vouching whatsoever. A weak case without that evidence so tainted. In this case, there was a robbery which turned into a murder. There's no evidence whatsoever that Mr. Curtis, the appellant herein, was present. There's no physical evidence. There's no fingerprints. There is no DNA. There are no photographs. There are no eyewitnesses. Nothing to show he was involved in this crime. Except for the testimony of two people, both of whom are extremely tainted by the felony murder and the robbery, and another with a motive to be prejudiced, and whose best testimony would be weak. Well, counsel, wasn't that an issue that was highlighted by the defense in this? You've got the instruction that says you need to be suspect of this testimony, and you have defense counsel repeatedly making the argument these witnesses have more to lose, you should not trust their testimony. Well, the problem with vouching is that who is a jury going to have a tendency to rely on and believe? Defense counsel who's representing somebody put on trial, accused of a crime, very serious crime, somebody who represents the state of California. And that's the problem with vouching, is no matter what the defense counsel may say, you still have that imprimatur of the government saying, we know things that you don't know, and you should trust us. He didn't say that, though, did he? Well, not quite in those words, but there were several instances. He said, I submit to you she's telling the truth. Well, there were other instances where added upon to that, he's saying, we know she's telling the truth. First of all, she said. Where did he say that, we know she's telling the truth? Well. What he said was that her testimony had the ring of truth, it wasn't embellished,  but he went more than that. There was discussion by him of the fact that if she doesn't tell the truth, we're going to know it. And. Where did he say that? He's, well, he's saying, well, first of all, he said it in his opening argument, basically he infers her compliance Well, what he says in the opening statement is that we're going to introduce a plea agreement, and the plea agreement calls for her to tell the truth. That's not improper, is it? Perhaps not in and of itself, but there are repeated statements relating to her, relating to her plea agreement, where he's indicating, if she doesn't tell the truth, the plea agreement's off. Well, but that's kind of a two-edged sword in the sense that if I were playing the devil's advocate, she has every reason to, you know, she's already made a statement, we know that. And so she's got to be consistent with that, and if she's not consistent with that, then she loses her plea agreement. So this person's got everything to lose by not staying consistent, but that still presupposes what if she lied in the first place? You know, so what you're dealing with, you're not dealing with a good Samaritan, you're not dealing with a person that doesn't have, you know, a horse in the race. You're dealing with someone that, you know, wants her deal, and I think that jurors, reasonable jurors look at that and say, you know, we've got to look at her closely, because she does have everything to lose if she's not thought to be truthful. Well, yes, but in terms of the problem of repeated references to the plea agreement and not being truthful, once we're into the argument stage of the trial, the prosecutor now has heard her testimony. So now by vouching for her in the closing arguments, and he's saying, I know her to be truthful, but I don't know her to be truthful. Because if that were not the case, we would then be withdrawing her plea and saying the plea's no good, you have not testified truthfully. Counsel, wouldn't you agree with me that there's a difference between the rather bland statement made in opening and the argument that's made in closing? But at that point, defense counsel has opened that issue and is openly accusing the witness. And I think the case law says that you have a right then to comment on your, why this person has an incentive to tell the truth. Well, the district court found that, in fact, defense counsel did not first refer to that. But it was in response to the defense's, or excuse me, the prosecution's continuing references to her being truthful about the plea bargain. And, again, once the close of evidence comes in, he's still saying, I know her to be truthful, but I don't know her to be truthful. He's just saying we know her to be telling the truth. Because here we are, we're arguing she told the truth, we're arguing this plea agreement is still good, therefore we have this knowledge that she's being truthful. Well, let me ask you this, since the posture that we've received the case, what is the clearly established federal law at issue in this case? Well, the standard is whether the trial is fundamentally unfair. And I believe it was, because there were numerous, numerous instances of prosecutorial avowsing and assertions of extraneous knowledge. For example, this whole interview with Ms. Mankiam. First there was an interview, which wasn't recorded, and then the investigating officer had discussion with the prosecutor about what it was said. And then the prosecutor sent the law enforcement officer back to do another interview. The first wasn't taped, the second was. There was a big difference in the two interviews, because in the untaped interview, supposedly the witness said, well, Mr. Curtis said he drove to the scene of the crime, and yet in the recorded statement that didn't come. So now we have the prosecution thrusting itself into the investigative process, and what are the facts that we know that you don't, that we are going to tell you we know, but we're not going to tell you what they are. And then other instances of saying, well, we know other cases, we have personal knowledge of other cases, and this is a strong case relative to these other cases that we're not going to tell you about, we're not going to tell you what the evidence is, but just trust us, we know this is a strong case. Also, we only file when we have all the evidence and circumstances to put a case before you, the jury. And again, that's saying there's things here we know that you don't. So it's ongoing, ongoing vouching, assertions of knowledge, cumulative, numerous statements that are going throughout the trial. And... And that, because of the cumulative problem, because of the weak evidence, because of the continued instances of vouching and knowledge, and because the only evidence comes against, one, somebody, Ms. Mankim, who's upset because she finds out her boyfriend's got another girlfriend, and two, Ms. Padilla, who's worried about getting the death penalty, I don't think the vouching, I know the vouching here overwhelmed this trial, resulting in prejudice, and I'd like to reserve my last minute for rebuttal. Sure. Thank you, Mr. Stern. Good morning. Good morning, Your Honors. Deputy Attorney General Tom Shea on behalf of Respondent Alameda. There are four issues I'd like to discuss this morning. First is whether the AADPA standard of review, that deferential standard, applies here. There is some issue. Here the district court correctly concluded that the AADPA standard of review does apply, and there's a couple points I want to mention here. First is that Petitioner's vouching claims that he raised on direct state appeal, and which he also raised on state habeas and later on federal habeas, all of his vouching claims involved the same two witnesses, Cindy Manikam and LaShawn Padilla. And in addition to that, as noted by the district court, his vouching claims, which he presented on state habeas and federal habeas, they refer to many of the same passages and the same comments of the prosecutor. So here the district court did correctly conclude that the AADPA standard of review does apply. Another point I wanted to mention, too, was that in addition the Los Angeles County Superior Court on state habeas applied the procedure bar stating that Petitioner's vouching claims were already previously raised and rejected on appeal. So essentially you've got two courts finding that the claims on habeas and on direct appeal were the same. And so our position is that the AADPA standard of review does apply. And that being said, vouching seems to be kind of a popular issue these days. I mean, we seem to be seeing a lot of this. But I would have to say this is more excessive than, you know, than some that I've seen. So why isn't it a problem here? A couple points is that as specifically the only case, the only Supreme Court case that I could find that specifically addressed vouching was the United States v. Young. And in that case, the federal prosecutor basically stated, quote, unquote, we vouch for the testimony of two witnesses. And the U.S. Supreme Court found no error, let alone a due process violation. It didn't even get close to considering due process. It just found no error. And some of the points noted by the court in Young, it's at footnote, I believe it's footnote two in the Young decision, is the U.S. Supreme Court, they noted that curative instructions were given in that case, and they specifically cited two sets of instructions, one, that the jurors were the sole judges of the witnesses' credibility, and number two, that the witnesses in that case were accomplices, and therefore, their testimony should be viewed with greater caution. And those similar instructions are given in this case. This circuit has applied Darden and Donnelly in addressing vouching claims, but technically Darden and Donnelly, the comments involved there were not vouching comments. I think in Darden, there were statements that the Department of Corrections in that case was at fault for the murders committed by the defendant in that case, because he committed the murders when on furlough. And in Donnelly, essentially, the prosecutor implied that the defense sought a plea, but the prosecution rejected it. So those technically weren't vouching claims. But in any event, Darden and Donnelly have been applied by this circuit in determining whether there's a due process in terms of vouching. And a couple points I want to make here. Roberts. Counsel, I'm not sure that you answered Judge Callahan's question. Let me read you one of the parts of the closing. The mannequin came in and she told you the truth. Isn't that just absolute vouching? I respectfully disagree, and the reason is because those comments have to be considered in context. And in discussing both the credibility of Padilla and also Manicam, the prosecutor did state that each of them told the truth. But consider in context, those statements are based on the evidence and were basically reasonable inferences and conclusions based on the evidence. For example, as to Manicam, he cited several facts presented at trial showing that she's credible, including that she testified despite being threatened, and also that her in-trial testimony was corroborated by her prior out-of-court statements to Detective Chumley. And as to Padilla, he did the same thing. He argued that based on the provisions of the plea agreement, she had to be truthful. And also, more importantly, he argued that, look, she didn't give us everything that we wanted. For example, he specifically pointed out that she didn't place Petitioner at the crime scene. So I think the prosecutor's comments are more properly or proper. And in any event, the key issue here isn't necessarily whether the prosecutor's comments constituted vouching, but whether the prosecutor's comments violated due process. And the key argument is that the quality of the state of the evidence come in here, that Mr. Stern said this was a very weak case. That does come into play in considering whether there is a due process violation. It's one of the factors noted by the court in the U.S. Supreme Court in Darden. What's your assessment of the strength of the evidence in the case? Well, this is a conspiracy case. And of course, every conspiracy case, you're not going to have direct evidence. Conspiracy cases, by their very nature, are kind of he said, she said. So I think the key issue here is credibility. And essentially, Petitioner here — How is that helping you, counsel? That hurts you. That does hurt. But again, the key issue in this case is credibility. And essentially, Petitioner corroborated Padilla's testimony. Padilla basically testified that Petitioner, Shannon LeBleu, and herself discussed robbing the victim. And Petitioner basically said that he was there at that conversation. His only difference, or the key difference in his testimony was he said that he didn't participate in it. Well, you have two witnesses who, in effect, testify against Curtis. Correct. And both of them are subject to statements about you should believe them. They are telling the truth. And it strikes me that in terms of the strength of the evidence, that there is — other than those two witnesses, there is nothing. Aside from — the testimony of those two witnesses clearly was key in this case. There's also Petitioner's flight, which indicates consciousness of guilt. Well, doesn't Petitioner have a little trouble keeping a straight story on his alibi? That's one of the points I was trying to make, was that here Petitioner — to the extent it's a credibility contest, Petitioner's credibility was clearly suspect. In addition to corroborating the testimony of Padilla, he also admitted on stand several times that he lied. I think in addition to admitting that he lied to the police, he also — one of his alibis was he was with someone named quote-unquote Lisa, but he couldn't remember her last name and he didn't present her at trial. So I think there's a lot of evidence. Then he testified that he was with Jackie, but that may just suggest that he has a lot of girlfriends. Well, then the question before the jury is, is he with Lisa? Is he with Jackie? I mean, his story is — it isn't consistent. And aside from that, aside from the strength of the evidence, one of the factors that this Court has to consider is the instructions, whether the instructions were — were there adequate curative instructions given. And here Petitioner's primary argument is that instructions have to be specific and timely in order to have any curative effect. And that simply isn't a law — isn't a rule that's based on the Constitution, or there's no constitutional basis for that rule. The cases he relies upon are direct view cases of federal criminal prosecutions, and also in Darden and Donnelly, the relevant Supreme Court cases, there's no statement by the U.S. Supreme Court that instructions must be specific and timely in order to cure. And indeed, even this circuit, that's not even a clear rule in this circuit, as noted in our briefs. There's other Ninth Circuit cases, several Ninth Circuit cases, where general instructions have been noted in finding no due process violation, and there's no indication in those cases that those instructions have to be specific and timely. I think the final point I wanted to make is, to the extent that he's raising any uncertified issues, here the specific issue granted the certificate of appealability is vouching. And he's trying to bring in other — saying that the prosecutor brought in extraneous — or basically brought in extraneous knowledge or interviews and things like that, but that — those issues aren't before this Court. And with that, I've hit on the main points I wanted to. The final point — yeah, I've hit on the points I wanted to. And I'll — unless this Court has any additional questions, I'll submit the briefs and what was said here. Thank you, Robert. Thank you very much. Thank you, Your Honor. Mr. Stern, you get the last word. Thank you, Your Honor. Regarding review by the state courts, there's a couple points to be made. The area of vouching brought up on the direct appeal was a different item of vouching. That had to do with Padilla being concerned about the death penalty. The items of vouching — and here are different items of vouching. And then when the superior court on the habeas said, well, the court of appeal had already addressed things. Well, they hadn't. They had only addressed one issue of vouching. Plus, you have the fact that here you have numerous instances of vouching. So the state court didn't deal with the issue of cumulative vouching, cumulative problems of vouching causing prejudice. Ms. Padilla's own sister said, on important matters, Ms. Padilla will lie at the drop of a hat. Are you saying that the prosecution cannot argue the credibility of the witnesses? Well, in terms of the strength and the weakness of the case, I'm saying that defense presented evidence that Ms. Padilla, by her own sister, says she's a liar. Right. And they're entitled to answer that argument, aren't they? Well, yes. But that did not involve any of the vouching itself in terms of vouching for — there was no vouching in terms of that statement. And then — I see you're out of time, but if you want to conclude your thought, you could do that. Yes. In terms of whether or not something's within the certificate of appealability, these extraneous matters like the talking about the interview with the officer, there were two interviews, et cetera, it all ties into the vouching. It all ties into saying, this is why we know Padilla's telling the truth. This is why we know Ms. Mankiam is telling the truth. Thank you, Your Honor. Thank you, Mr. McJay. Thank you very much. The case just argued is submitted. Good morning.
judges: Silverman, Callahan, Robart